Filed 11/12/13  In re Zachary B. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re ZACHARY B., a Person Coming Under the Juvenile Court Law. | |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY, | C070723 |
| Plaintiff and Respondent, | (Super. Ct. No. J04454) |
| v. | |
| SABRINA B., | |
| Defendant and Appellant. | |

Mother, Sabrina B., appeals from the juvenile court's order that denied her request for in-home visitation with minor Zachary B. and maintained existing visitation orders. (Welf. & Inst. Code, § 395.)[1]  We affirm.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother brought the minor to the San Joaquin County Human Services Agency (the Agency) in November of 2006 because she was unable to take care of him. The minor, who was four years old when these proceedings began, suffers from major psychological problems, including attention deficit hyperactivity disorder, which cause him to act out impulsively and aggressively. Counseling and psychotropic medication have had only a limited effect. Since May 2007 the minor has mostly been placed in group homes and has been deemed unadoptable.

The minor's behavior in the group homes has been problematic. For example, in April 2008, the minor "got into a 'locked' medicine cabinet at his group home." The cabinet contained Alavert, Seroquel, Clonidine, Tylenol, Abilify, and Zoloft. The minor convinced another minor that the medications were candy. Both overdosed and were taken to the hospital for treatment.

By November 2009, mother had made progress in her reunification plan, both mother and minor were participating in parent-child interactive therapy, and the home where mother was living with her boyfriend, Michael J. was deemed safe and suitable for the minor. The social worker recommended the minor be returned to the custody of mother, with family maintenance services. The juvenile court returned the minor to the custody of mother under a family maintenance plan.

In March 2010, the minor was admitted to John Muir Behavioral Health Center on a "section 5150" hold. Upon return to the home, the minor's behaviors escalated and affected mother's own mental stability. Mother stated she was not capable of supervising or controlling the minor, even with the intensive counseling services that had been provided. Pursuant to a section 387 petition filed by the Agency, in July 2010 the juvenile court placed the minor in a group home, terminated mother's reunification services, and adopted a planned permanent living arrangement as the minor's permanent plan.

A December 2011 status review report stated that the minor, who was then in fourth grade and taking three different psychotropic medications, had "more good days th[a]n bad days" at school, but still frequently had behavioral problems at the group home.

On December 21, 2011, the juvenile court held a hearing on mother's request for in-home visitation. The Agency originally suggested the idea, hoping it might encourage the minor to improve his behavior. However, a social worker who was present at the hearing told the court he found an "overwhelming [odor] of marijuana" during a home visit. He recommended against the minor being returned to that environment. The Agency also had "concerns" about Michael J., mother's "live-in" boyfriend, because he had a long criminal history, including possession of marijuana and resisting arrest. Michael J. had become aggressive during the social worker's home visit. The minor's counsel agreed with the Agency that the marijuana issue made in-home visitation inappropriate.

Mother's counsel stated that mother had a medical marijuana card. Mother added that she also had a letter from her doctor. Counsel further stated that mother had only been smoking marijuana inside of the home over the last year and half since the minor last had been placed with her, and mother was willing to refrain from use for a reasonable period before in-home visits.

Mother's counsel stated that mother smoked marijuana at home. However, when the minor was living in the home, mother smoked only outside the house and outside his presence. Mother stated that whatever marijuana she had in the house was kept in a locked box. She added that Michael J. also had a medical marijuana card.

The juvenile court declined to order in-home visitation at that time, but stated that it might reconsider the issue if mother and Michael J. both provided their medical marijuana cards and were willing to avoid smoking for a reasonable time before in-home visits.

3

**Contested Hearing Testimony**

On February 27, 2012, the juvenile court held a contested visitation hearing. The court heard testimony from the social worker, mother and Michael J.

**The Social Worker's Testimony**

The social worker stated that when he went to the home on an announced visit in November 2011, he found an overwhelming odor of marijuana that was so intense he had to leave without doing a complete home inspection. The social worker stated that both mother and Michael J. denied there was an odor. Also, they "initially" denied they had been smoking marijuana.[2] Acknowledging that mother had stated she had a medical marijuana card, county counsel told the court he was recommending against home visitation only because of the smell. The social worker also stated that the minor had been moved from a group home in Davis to a group home in Stockton, nearer to mother's residence, and the Agency approved of mother visiting the minor there as often as possible.

**Mother's Testimony**

Mother testified she was requesting overnight visits, monthly at first, then weekly, with the hope of eventually regaining custody. She and Michael J., whom she called her fiancé, now visited the minor three to four times a week, ranging from two to five hours at a time. The court's orders allowed them to have a 12-hour visit, so long as they did not take the minor home.

---

[2] After the social worker said mother and Michael J. "initially" denied smoking marijuana, the court asked about the group home in which the minor was residing. County counsel had no further questions regarding the issue, and neither counsel for mother nor counsel for the minor asked the social worker any questions. At the December 2011 hearing, counsel for the social worker told the court that mother and boyfriend "first denied use of marijuana *and then later admitted using it that day*." (Italics added.)

Mother did not remember denying marijuana use when the social worker visited in November 2011. She testified, "we were surprised when he asked. But by -- at the end, we told him." Mother believed the Agency had known about her medical marijuana recommendations since 2006.[3] She had had a valid card consistently since that time. Mother and Michael J. explained to the social worker that in November 2011, they did not think it mattered whether they smoked in the house at that time because the minor had not lived there for a year and a half. Michael J. also had a medical marijuana card and mother had provided the social worker both of the card numbers in a telephone conversation. She did not produce her card to the social worker during the visit because it had just expired and she had to get a new one, which she did immediately afterward.

Mother used marijuana for "seizures and anxiety." She had had a seizure in the minor's presence during a group home visit in December 2011. The seizures generally occur once or twice a week and last 10 to 20 minutes. She needs help as she is coming out of a seizure, because she is "kind of confused." She smokes after some, but not all seizures. Marijuana relieves the pain and it does not affect her liver, with which she has "issues." Other pain medications "knock [her] out" and prevent her from functioning. If a seizure occurred during the minor's home visit, she would endure the pain rather than smoke. A seizure during a home visit would not create a problem in controlling the minor because mother always had Michael J. or his mother with her. Unlike other forms of medication, marijuana enabled her to continue functioning. Michael J. smoked "[w]hen he has pain." Both smoked "when we feel the need."

Mother stated that since the social worker's visit in November 2011, she and Michael J. "no longer medicate in the home" and they bought an air purifier. She said they would guarantee that they would not "medicate" for 72 hours before visits or during

---

[3] A July 2008 status review report indicates that on July 18, 2008, mother reported she had obtained a medical marijuana card because of seizures and migraines.

5

visits. All prescribed substances in her home were behind locked doors. She stated that the social worker had not been back to visit and invited a return visit.

Mother and Michael J. had developed "house rules" for the minor in the event he was in the home with her, including "no biting, no hitting, keep your hands to yourself, to be respectful to others, no swearing, to not touch or mess with property that is not his own." They had also prepared a safety plan based on what they had learned through "wraparound services." These services taught them that the minor was a special needs child from whom they had expected too much in the past. They had also learned proper methods of redirecting him and restraining him if necessary.

Since the minor had been moved to the new placement, mother believed he was much happier, with fewer outbursts. The group home kept mother and Michael J. informed about how things were going there.

**Testimony of Michael J.**

When the social worker visited in November 2011, Michael J. did not deny having recently smoked marijuana. He had a valid medical marijuana card for arthritis, and had had a card since 2005. Like mother, he said they no longer "medicate" inside the home and they obtained an air purifier. He would guarantee that he would not "medicate" 72 hours before visits. He was willing to take any further previsit precautions the Agency might suggest. He now smoked marijuana in a shop he had on his property.

In a given week, Michael J. might not need to smoke marijuana at all, or he might need to smoke five times a week; it depended on whether his arthritis flared up. He still worked as a carpet installer. This might make the arthritis flare up more than when he did not work. He "cho[]se not to use" other drugs that are prescribed for arthritis because he had looked them up and did not like their side effects. He might take aspirin sometimes. His current doctor recommended marijuana for his condition. He saw this doctor once a year. He got his marijuana from a "delivery service," whose name he did not recall. So far he had used the service only once, purchasing two ounces.

6

He did not have a regular recommended dose, but tried to use as little as possible, so two ounces would last "[a] very long time."

Michael J.'s mother, who was a nurse, had originally diagnosed him with arthritis. He believed he had suffered from it since he was 12 years old. The only doctor who had diagnosed arthritis was the one who prescribed marijuana for him. When asked what testing the doctor had done in diagnosing his arthritis, Michael J. replied "medical tests." When asked what specific testing was done, he said he was unsure, adding, "I'm not a doctor." No blood work was done.

**The Juvenile Court's Ruling**

The court stated that the social worker's statement about the overwhelming odor of marijuana in November 2011 was a matter for concern because the minor would be exposed to secondhand smoke. The court observed, "There's some dispute as to whether or not the parents admitted to use or not, which is disheartening to the Court. If that's the case, they should be up front, let them know what is going on, not hide that fact. That was a concern." On the other hand, the precautions mother and Michael J. had now taken "impressed" the court; they were "steps in the right direction."

The court remained concerned that the minor was a special needs child who still displayed "poor impulse control" in the group home and frequently needed to be restrained for his own safety and the safety of both peers and staff. Furthermore, the fact that he was on medication raised the question whether mother and Michael J. would be able to administer the medication correctly, if, for example, mother had a seizure while Michael J. was out of the house. The court had been provided no information about Michael J.'s mother and there was no evidence that she would be available when needed.

Michael J.'s account of his arthritis and the need for marijuana to treat it was "suspect" because it was diagnosed by a doctor seeing him for the first time, who

administered no blood work or other testing. It was unclear whether the condition was really arthritis, if so how severe, and whether there were alternative approaches.

Mother used marijuana, by her own account, to relieve pain from her seizures, not the seizures themselves. The court remained concerned about "what condition these parties will be in when they're using this marijuana, or having used it[,] and if the minor's going to be subject to that." Although the rules they had devised were "great," the court was not satisfied that there were "sufficient safeguards" for the minor, given his demonstrated needs and problems.

In light of the above, the court ruled that extended home visits were not appropriate at that time. In response to mother's request that the Agency conduct a home inspection, the court said the social worker could return for an inspection if he chose to do so. The court was of the opinion that the safety plan for the minor was not sufficient. "So until we come up with something different, visits are going to remain as previously ordered." In particular, the court wanted it clarified whether there were alternative treatments available for mother's seizures and whether her treating physician was aware of the minor's needs and what might occur when he was on medication.

The court thereafter entered written orders maintaining the existing visitation order and setting the matter for further hearing in June 2012.

### DISCUSSION

Mother contends the juvenile court abused its discretion by denying her request for in-home visitation.[4] We disagree.

---

[4] Mother asserts that her oral request for a change in the visitation orders should be deemed a section 388 petition, although she did not file a written petition. The Agency appears to agree that we could construe mother's request as a section 388 petition. We need not decide whether we should do so, because the standard of review -- abuse of discretion -- is the same whether we consider the issue under section 388 or section 385, which provides that a juvenile court may at any time change, modify, or set aside an

"Whether an order should be modified rests within the sound discretion of the juvenile court. Its decision will not be disturbed on appeal absent a clear abuse of discretion. [Citation.]" (*Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 118-119.)

Mother asserts that the court abused its discretion by finding her proposed precautions insufficient to ensure the minor's safety during in-home visitations. In her view, the court could not reasonably doubt her promises that she would abstain from marijuana use before and during the minor's visits because "there was no evidence in any of the dependency proceedings that Mother abused drugs or that her use of medicinal marijuana affected her parenting skills or relationship with [the minor]." According to mother, "the evidence supported only one inference: that Mother would not be under the influence of medicinal marijuana during any in-home visitation with [the minor]." Mother's argument is unpersuasive.

First, the court made express or implied credibility findings adverse to both mother and Michael J., which are supported by substantial evidence. The court expressly found that Michael J.'s alleged need for medical marijuana was "suspect" because his purported condition had never been properly diagnosed, and the inferiority of other treatments for it had not been established. The court expressed concern about what mother and Michael J. told the social worker about their marijuana use during the November 2011 visit. While mother said she did not remember initially denying marijuana use, Michael J. unequivocally said he made no such denial. The court noted that any such denial would be "disheartening." We observe that neither mother nor Michael J. denied having told the social worker there was no odor in the home.

---

existing order, with or without request by a party. (*In re S.R.* (2009) 173 Cal.App.4th 864, 866, 870 [§ 388].)

9

This evidence gave the court cause to question the credibility of mother's promise to abstain from marijuana use before and during the minor's home visits.

Second, even if credible, mother's promise did not resolve all potential problems. By her own admission, she could have a seizure during a visit by the minor. Even if she did not use marijuana during a visit, it was unclear how she could cope with the minor's needs, including his need for medication, if mother was undergoing a seizure or immediately afterward -- when, as she acknowledged, she would need help herself. And, as the court found, there was no evidence that Michael J. or his mother could be counted on to help at such a time. The minor's supervision *at all times* was critical in light of his history, which included raiding a locked medicine cabinet and eating the contents as if it were candy.

It was undisputed that mother and Michael J. had ample visitation at the minor's group home and those visits went well. It was also undisputed that the minor remained psychologically fragile even in that controlled environment, where expert help was presumably available at all times. Under the circumstances, the juvenile court could reasonably exercise its discretion to maintain the status quo as to visitation, subject to reconsideration if further evidence favorable to mother's request were presented in the future.

## DISPOSITION

The order appealed from is affirmed.

MURRAY , J.

We concur:

HULL , Acting P. J.

DUARTE , J.

10